**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RICHARD TAYLOR, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| | ) No. 19 C 5918 |
| v. | ) |
| | ) Judge Virginia M. Kendall |
| PROFESSIONAL SECURITY | ) |
| CONSULTANTS, INC., | ) |
| | ) |
| *Defendant*. | ) |

## MEMORANDUM OPINION AND ORDER

Defendant Professional Security Consultants hired Plaintiff, Richard Taylor, when he was 59 years old to serve as a security guard at Hawthorne Mall. Taylor racked up numerous performance reports while working at Hawthorne Mall, so PSC gave him the option of resigning or being reassigned to Old Orchard Mall. He took the latter option and began working at Old Orchard Mall only to be written up for similar violations and for insubordinate behavior. Finally, after investigation, PSC fired him. Taylor then filed this suit against Professional Security Consultants, Inc. ("PSC"), for violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq., claiming that PSC fired him due to his age. PSC filed this motion for summary judgment. (Dkt. 62). Taylor fails to establish a *prima facie* case for age-based discrimination, and even if he could, he cannot show that his firing was a pretext for discrimination. Therefore, Defendant's motion [62] is granted.

## BACKGROUND

Plaintiff, Richard Taylor, is an individual formerly employed by PSC as a security guard at Hawthorn Mall and Old Orchard Mall. (Dkt. 1). Defendant, PSC, is a security-based firm

1

providing security services to various entities including shopping malls. *Id*. Taylor filed an age discrimination charge on June 4, 2018, with the Illinois Department of Human Rights and EEOC. *Id*. Following the resolution of his claims with the IDHR, Taylor filed a five-count Complaint in this Court on September 4, 2019, alleging violations of the ADEA, 29 U.S.C. § 621-634. *Id*. On January 29, 2020, the Court dismissed Counts III and IV of Taylor's Complaint regarding retaliation and ADEA coverage claims.

### A. Hawthorn Mall Employment

PSC hired Taylor to work at Hawthorn Mall on May 29, 2015, as a security guard when he was 59 years old. (Dkt. 63 ¶ 16; Dkt. 69 ¶ 16; Pltf. Ex. A ¶ 4);(Def. Ex. 6 at 6, 25–26; Dkt. 63 ¶ 17; Dkt. 69 ¶ 17). Taylor worked in security since graduating high school in 1975. (Def. Ex. 6 at 7; Pltf. Ex. A ¶ 3; Dkt. 69 ¶ 58; Dkt 74 ¶ 58). His responsibilities at Hawthorn Mall included patrolling, both on foot and while in a vehicle; he was also trained at Hawthorn Mall to run dispatch and to monitor computers. (Pltf. Ex. A ¶ 5).

### i. Notices for Improvement

The filing of a Notice for Improvement form ("NOI") tracks written or verbal warnings employees receive and is a disciplinary action utilized by PSC. (Pltf. Ex. A ¶ 23). Over the course of Taylor's almost three years working for PSC, eight NOIs related to his job performance were documented. (Def. Ex. 7 at 6, 15–16, 18, 21–23, 25–26). While working at Hawthorn Mall from the end of May to the end of December in 2015, two NOIs were recorded flagging issues in Taylor's job performance. *Id*. at 6, 21.

Taylor's first write-up was on December 12, 2015, when Assistant Security Director Nicholas Blaylock wrote that he advised another officer to serve Taylor with a verbal write up due to completing only one tour of the mall over a seven-hour period. (Def. Ex. 7 at 2, 21). As a

security guard, PCS required Taylor to be on a tour of the mall at all times during a shift.  *Id*.  A

Notice for Improvement form ("NOI") was drafted related to this incident.  *Id*. at 21.  Taylor

refused to sign the NOI as was customary and therefore Blaylock noted on the  NOI that "Officer

Taylor got up from his seat and walked out of the office.  He refused to speak to me and refused

to sign the verbal write up."  *Id*.  Assistant Director Blaylock further detailed the interaction in an

email to Security Director Lucia Garcia, indicating he called Taylor back to the office and "advised

him that he was being insubordinate and that I would not tolerate such behavior."  *Id*. at 3.

Blaylock wrote Taylor refused to sign the form and would speak only to Director Garcia.  *Id*.

Taylor claims that his behavior at times was perceived by others as insubordinate when instead he

was following what he understood to be encouraged behavior by the employee policy handbook.

(Dkt. 69 ¶ 30; Pltf. Ex. A ¶ 20).

On the following day, Blaylock filled out another Notice for Improvement form for Taylor.

(Def. Ex. 7 at 6).  Blaylock noted in the comments section: "Area for Improvement" detail, "Taylor

failed to report a man with a gun and interacted before notifying Security Communications and his

superior officer.  Note that Taylor used a loud tone . . . via radio when Assistant Security Director

Nicholas Blaylock asked to [clarify] further details of what had occurred."  *Id*.

### ii.    Additional Behavioral Reports

In addition to those incidents that resulted in written disciplinary action in the form of

NOIs, Taylor's actions were flagged on other occasions as inappropriate.  On August 5, 2015,

Security Dispatch Andrey Melnick submitted a report to Director Garcia indicating that Taylor

took 50 minutes when he is only mandated a 30-minute break.  (Def. Ex. 7 at 7).  On the following

day, Director Garcia documented a meeting with Assistant Director Blaylock and Taylor where

concerns of his job performance were raised.  *Id*.  Specifically, Director Garcia described, "Taylor

has been reported on not reporting inspections, sleeping, and taking both 30-minute breaks together. . . . CCTV coverage shows that Richard Taylor was sleeping in the Dispatch office and at the Supervisor's desk." *Id.* Taylor denies he was sleeping during his shift or shown a video of the alleged incident. (Dkt. 63 ¶ 35; Dkt. 69 ¶ 25; Pltf. Ex. A ¶ 6). Taylor was also flagged as arriving late to work on April 17, 2015. (Def. Ex. 7 at 19).

On August 13, 2015, Assistant Director Blaylock documented another incident with Taylor. (Def. Ex. 7 at 4). In the record, Dispatch called Taylor multiple times over the radio and received no response. *Id.* Blaylock wrote, "Taylor was advised that he must keep his radio on at all times during his shift and acknowledge all traffic. Taylor then responded with an attitude and used improper radio traffic to call dispatch. Taylor was advised again of the importance of radio usage and traffic." *Id.* Blaylock indicated that Taylor missed three calls over the radio two hours later. *Id.* On September 11, 2015, Blaylock again documented concerns with Taylor's operation of the radio and alleged failure to respond when called over the radio. (Def. Ex. 7 at 5 ("This has been ongoing and I have personally spoke[n] to Taylor about this issue and the importance of radio response.")).

### iii.    Fire Alarm Incident & Transfer

On December 13, 2015, a fire alarm went off at Hawthorn Mall. *Id.* at 8. Taylor's response to this alarm and the resulting fall-out ultimately led to his transfer to a new location. (Def. Ex. 7 at 20; Pltf. Ex. A ¶ 8–9). Taylor attempted to evacuate tenants and customers from the mall after the fire alarm went off. (Def. Ex. 7 at 10–14; Pltf. Ex. A ¶ 8). He claimed a supervisor told him it was acceptable to advise people to leave the building, which aligned with the evacuation instructed over the public announcement system. (Pltf. Ex. A ¶ 8). On December 14, 2015, a day after the fire alarm, Assistant Director Blaylock wrote to Director Garcia about complaints he

4

received from General Manager Rutzen regarding Taylor's behavior during a fire alarm on December 14th at the mall. (Def. Ex. 7 at 8). According to a number of complaints, Taylor was yelling at tenants aggressively to leave the building immediately because there was a fire and that he was scaring everyone in the area; although he later told Baylock that he began evacuating tenants on his own and later notified his supervisor. *Id.* at 14. He indicated Rutzen claimed to have heard multiple complaints from tenants regarding the incident as well. *Id.* Director Garcia received an email on December 15, 2015, directly from General Manager Rutzen, wherein he wrote, "In light of the issue on Sunday night with the fire alarm, along with the numerous complaints I have received from shoppers and retailers, I am requesting that you remove Richard [Taylor] from duty at Hawthorn." *Id.* at 9.

Three other PSC employees signed written statements recounting recollections of the incident. *Id.* at 10–13. In their accounts, each shared that tenants at the mall complained about Taylor's behavior during the alarm and claimed Taylor told a co-worker to "shut up" during the incident.[1] *Id.* Assistant Director Blaylock documented in an email to Director Garcia an account of a conversation with Taylor on December 18, 2015. *Id.* at 14. In the account, Blaylock wrote that Taylor first denied telling a co-worker to "shut up" and claimed he received approval to evacuate the mall before acting. *Id.* Blaylock went on to write, "Taylor later admitted that he did

---

[1] PSC employee Bree Pankow's account stated, "The employee came down to the dispatch window very upset and pointed to Taylor and said 'This guy right here scared and freaked everyone out!' . . . About 15 minutes later, the employee called dispatch and said he would be talking to Jeff Monday morning because he wanted Taylor terminated." (Def. Ex. 7 at 10). PSC employee Jacky DeLeon's account stated, "On Sunday when the fire alarm [went] off I had a tenant . . .come up to me saying she was scared because officer Richard Taylor had told her that she had to leave the building because there was a fire. . . . I told her that it was not true and that it was a false alarm and to go back to her kiosk because everything was fine. She later came to look for me again and told me that Richard Taylor wouldn't leave her alone. That he was kicking her out of her kiosk yelling at her and freaking everyone out." (Def. Ex. 7 at 11). PSC employee Alyssa Wardrop's account stated, "Taylor was telling people to leave the mall without being cleared to do so and he told me and Jackie to do the same which we did not because we weren't given a clear to do so." (Def. Ex. 7 at 13).

tell [his co-worker] to shut up and that he was only worried about a tenant that might overhear their conversation." *Id*. Blaylock wrote that Taylor "later admitted that he began to evacuate shoppers on his own and then notified [his supervisor] at a later time. . . . It is clear that Officer Taylor is unable to give accurate information of what happened and has shown dishonesty towards his Security Directors." *Id*.

On December 24, 2015, Director Garcia wrote an email to Regional Director Dale Harnew summarizing a phone call with Taylor from the same day. *Id*. at 20. Director Garcia wrote, "Myself and Dale told Taylor that he would no longer be scheduled at Hawthorn Center by the request of the client, General Mall Manager Jeff Rutzen. . . . During that time, Taylor was notified that he would be transferred to Old Orchard Mall located in Skokie, IL." *Id*. Taylor was given the option to either transfer to Old Orchard Mall or resign. (Pltf. Ex. A ¶ 8–9; Def. Ex. 7 at 20). Director Garcia recorded that Taylor said they needed to let him know who filed complaints against him, and Director Garcia told him he could come in to speak directly about the matter. (Def. Ex. 7 at 20). Director Garcia also wrote in the email that all meeting recaps were documented and provided to Regional Director Dale Harnew and Regional Director Hector Acevedo as well as placed in Taylor's Human Resources folder. *Id*.

## B. Old Orchard Mall Employment

In December 2015, following the fire alarm incident, PSC transferred Taylor to work at Old Orchard Mall. (Def. Ex. 6 at 26–28, 49; Dkt. 63 ¶ 39; Dkt. 69 ¶ 18, 39). While working at Old Orchard Mall, Security Director Rishi Mishra directly supervised Taylor. (Def. Ex. 6 at 46; Pltf. Ex. A ¶ 11; Dkt. 63 ¶ 20; Dkt. 69 ¶ 20). At Old Orchard Mall, there were no PSC security guards older than Taylor, and Taylor claims he was referred to as the "old guy" by his coworkers. (Def. Ex. 6 at 28; Pltf. Ex. A ¶ 16; Dkt. 63 ¶ 85; Dkt. 69 ¶ 85).

### i.      Notices for Improvement

During his first month at Old Orchard Mall, an NOI was issued for Taylor detailing, "On Monday, January 18, 2016, Security Officer Richard Taylor failed to return loaned equipment from Dispatch." (Def. Ex. 7 at 15; Dkt. 63 ¶ 41; Dkt. 69 ¶ 41). Taylor claims, "It was a common mistake among security officers to forget to return loaned equipment to dispatch, and I learned through this litigation that PSC claims that I got an NOI in my first month at Old Orchard Mall for failing to return loaned equipment. I do not remember getting a write up for this incident." (Pltf. Ex. A ¶ 25).

A few months later, on March 22, 2016, an NOI recorded Taylor as eight minutes late for his scheduled shift and refusing a uniform inspection. (Def. Ex. 7 at 18). Taylor denies he appeared out of uniform and claims, "I always wore my uniform to work and I do not remember getting in trouble for not wearing my uniform to work." (Pltf. Ex. A ¶ 24).

Another NOI documented Taylor's refusal to stand by for unattended bikes in a common area as directed on November 8, 2016. (Def. Ex. 7 at 16). The description included, "Taylor stated over the two-way radio 'call a Supervisor, I'm done with these games'." The form indicates Taylor again refused to sign the NOI. *Id.* Taylor claims he was accused of doing something he didn't do while on patrol in November 2016 but did not recall the incident resulting in an NOI. (Pltf. Ex. A ¶ 27).

On March 25, 2017, an NOI flagged a lack of professionalism in Taylor's communications over the radio when he reportedly said, "It is raining out here, ain't no body stupid enough to ask for a jump out here" and "Send some to get that information," in response to a Security Dispatcher requesting information about the driver's license and vehicle registration. *Id.* at 23. Taylor

claimed he responded in this instance to flag that he and his coworkers could not hear dispatch at the time and did not intend to be unprofessional. (Pltf. Ex. A ¶ 38).

Almost a year later, on March 17, 2018, an NOI was drafted for Taylor for unprofessional behavior over the radio. (Def. Ex. 7 at 22). Mishra wrote an email to Vanessa Garcia about the incident and expressed having "fully lost [his] patience with Richard Taylor due to his on-going public display of disrespect towards the Supervisors, new hires, [Assistant Security Director] Brandon Ng, and my self [SIC]." *Id*. at 28. Taylor claimed he was called into Director Mishra's office on the same day and advised not to speak to other coworkers during his shift about non-work-related items. (Pltf. Ex. A ¶ 38). He claimed to have felt harassed and left the meeting "feeling upset." *Id*.

On March 26, 2018, an NOI documented that Assistant Security Director Brandon Ng told Taylor to conduct two processes when completing tours. (Def. Ex. 7 at 25). Taylor is recorded as responding, "you have to pay me extra for both" then walking away from the Assistant Director. *Id*. In an email recounting the event by Assistant Director Ng, more details included, "[Ng] attempted to speak with [Taylor] in which he proceeded to walk into the elevator and close the door. [Taylor] stated as the doors were closing, 'Go ahead have [Mishra] write me up.'" *Id*. at 27. Taylor claimed he was unable to complete one of the two processes because it required the use of his ID card which was lost by PSC in early 2018. (Pltf. Ex. A ¶ 41–43). Taylor alleged PSC did not replace his ID card. (*Id*.; Def. Ex. 6 at 55). On March 26, 2018, Taylor said he was told by Ng and Mishra to use another officer's ID card to complete the required processes. (Pltf. Ex. A ¶ 41 –43). Taylor originally refused since he believed using another person's ID was against company policy but eventually agreed to do so. *Id*. He did not recall a write up for this incident. *Id*.

8

Ultimately, Taylor received six NOIs during his approximately 27 months working at Old Orchard Mall. (Def. Ex. 7 at 15–16, 18, 22–23, 25–26). Taylor claims, "I never received in my hands an NOI nor had I ever signed one." (Pltf. Ex. A ¶ 23). He stated he never recalled refusing to sign something when asked by PSC while working at Old Orchard Mall, although all of the six NOIs include comments that Taylor refused to sign the document. (Def. Ex. 6 at 51; Def. Ex. 7 at 6, 15–16, 18, 21–23, 25–26). Taylor also claimed other younger employees did not sign NOIs issued to them and were not criticized. (Pltf. Ex. A ¶ 40).

      **ii.**      **Additional Behavioral Reports**

In addition to the NOIs drafted for Taylor, the record reflects other incidents where his behavior was documented as unprofessional or inappropriate. On October 9, 2016, Taylor was two hours late to work because he thought his shift started two hours later. (Def. Ex. 7 at 17; Dkt. 63 ¶ 43; Dkt. 69 ¶ 43). The form flagging Taylor's tardiness has a handwritten note on the page: "Pass/No Write." *Id*.

Mishra sent an email to Regional Director Hector Acevedo on November 13, 2016, wherein he wrote, "Richard Taylor continues [to] openly disrespect my Supervisors and Ed in front of my staff. . . . I know if officers do not want to sign a write up, we [state] 'Refused to sign' but Taylor refuses to sit down and discuss it or even wants to know what the write up is about. [General Manager] Serge Khalimsky has also had minor 'run ins' with Taylor and has displayed interest in removing him from Old Orchard. I think he should be placed on suspension just based off what he stated to Edward today in front of everyone in the Security Office, but please advise." (Def. Ex. 7 at 32). Taylor claims he was not disrespectful to Mishra or shift supervisors and that his efforts to raise concerns were misunderstood as being insubordinate. (Pltf. Ex. A ¶ 19–20).

On December 3, 2016, Mishra wrote to Regional Director Acevedo about an incident between a supervisor and Taylor where, against protocol, Taylor said, "I know" rather than "10-4" over the radio. (Def. Ex. 7 at 32). Director Mishra also wrote, "[the supervisor] isn't upset about this one situation but just all the previous incidents involving Taylor," and indicated he advised the supervisor to wait to contact Human Resources until Director Mishra could speak with Regional Director Acevedo. *Id.*

On April 22, 2017, Mishra forwarded an email to Acevedo from a "PSC Supervisor" recording an interaction from the same day with Taylor in which Taylor reportedly raised his concerns over the radio in an unprofessional and "disgruntled" manner. *Id.* at 30–32.

Director Mishra wrote to Regional Director Acevedo on June 26, 2017, sharing concerns about Taylor speaking in a disrespectful manner about a new hire while in the same vicinity of the new hire. *Id.* at 30. Mishra shared with Acevedo that the General Manager "has asked me what to do to 'get rid of Taylor' based on interactions he's had with him over the past 18 months. Most recently, Taylor was arguing active shooter guidelines during the [training] while [the General Manager] was there." *Id.* Taylor said he was told it was permissible to ask questions in the periodic meetings the General Manager held with security officers. (Pltf. Ex. A. ¶ 21). However, he said, "When I asked questions . . . I sensed resistance and antagonism from him. My questions were usually about doing things differently at this position than how I had done them in my prior work in security." *Id.* Specifically, Taylor said he attended the active shooter training and asked questions when the training differed from his previous education around active shooter situations. *Id.* at ¶ 22. Taylor claimed not to be hostile or challenging towards the trainer. *Id.* Following the training, Taylor said he was taken into Mishra's office and told "that they did not like me asking questions." *Id.*

On January 26, 2018, Mishra emailed Vanessa Garcia that Taylor refused to take a mandatory drug test when asked and instead offered to take the test the following day. (Def. Ex. 7 at 29). Mishra wrote that Taylor did not provide a reason. *Id*. Taylor claims he never refused to take a drug test but instead offered to take the test the following day such that a trusted witness could be present. (Pltf. Ex. 1 ¶ 34).

On March 23, 2018, Director Mishra wrote to Vanessa Garcia and Regional Director Acevedo about Taylor's refusal to sign two memos as directed by Mishra and a Security Dispatcher. (Def. Ex. 7 at 27–28). Mishra described Taylor as ignoring him until his shift ended then walking away. *Id*. He wrote, "I will create a disciplinary write up for insubordination which I will present to Taylor tomorrow." *Id*. Taylor claims he wanted more time to read both documents and was told by Mishra it was acceptable to sign the documents the following day. (Pltf. Ex. A ¶ 39). He said he believed, but was not certain, that he signed the memos the following day. *Id*.

On March 27, 2018, the General Manager of Old Orchard Mall wrote an email to Vanessa Garcia and Hector Acevedo stating, "I would like to have Richard Taylor removed from duty at this site effective immediately. I made this request almost 3 months ago." (Def. Ex. 7 at 33). Taylor said he was unaware of any complaints leveled against him by the General Manager or any tenants. (Pltf. Ex. A ¶ 47).

### iii.    Adverse Employment Actions

While at Hawthorn Mall, PSC trained Taylor on PSC's method of running dispatch and monitoring computers. (Def. Ex. 6 at 65–66). Taylor was assigned at times the responsibility of running dispatch while working at Hawthorn Mall. *Id*. When Taylor was transferred to Old Orchard Mall, he requested to run dispatch from one shift supervisor in a "quick conversation,"

but never directly asked Mishra. *Id.* He was never assigned to run dispatch although he claims younger security officers received that assignment. *Id* at 76–77.

Taylor claimed PSC reduced his pay when he was transferred to Old Orchard Mall but that he only learned of this over the course of the litigation. (Pltf. Ex. A ¶ 13). At the end of the following year, Taylor claims he received a pay raise from PSC while working at Old Orchard Mall. (Pltf. Ex. A ¶ 18).

While at Old Orchard Mall in 2016 and 2017, Taylor worked Mondays through Wednesdays with a shift supervisor named Gabe for most of his shift. (Def. Ex. 6 at 77; Pltf. Ex. A ¶ 28). Taylor worked on Saturdays and Sundays with a separate supervisor. (Pltf. Ex. A ¶¶ 28–30). Gabe departed PSC in January or February 2018. *Id.* at ¶ 36. Taylor claims he was assigned only walking patrol by supervisors other than Gabe, which was a duty within his responsibilities. (*Id.* at ¶ 30; Def. Ex. 6 at 69–71). Other younger security officers appeared to him to receive duties beyond walking patrol, including vehicle patrol, running dispatch, and monitoring computers, all of which he was trained to do. (Pltf. Ex. A ¶ 30).

Taylor complained to Mishra "about not being treated the same as the younger officers," but claims to have seen no change. *Id.* at ¶ 31. As a result, Taylor raised the same concern several times with a representative in Human Resources whom he had spoken with before. *Id.* Taylor also spoke with Acevedo in January 2018 when Acevedo was visiting Old Orchard Mall about his concerns. *Id.* at ¶ 33. Specifically, Taylor said he told Acevedo he was concerned that younger officers were being treated more favorably than him with work assignments. *Id.*

### iv. Termination

Taylor's last day of work at PSC was March 26, 2018, while working at Old Orchard Mall. (Def. Ex. 6 at 27; Def. Ex. 7 at 24; Dkt. 63 ¶ 21, 55; Dkt. 69 ¶ 21, 55). Taylor's employment was

terminated on April 19, 2018, with the reason listed as "Job performance." (Def. Ex. 7 at 24). Rishma informed Taylor of his termination. (Def. Ex. 6 at 23–24; Dkt. 63 ¶ 22; Dkt. 69 ¶ 22). Taylor claims he was told he was suspended on March 29, 2018, by Mishra pending an investigation but was not told about details of the investigation despite asking and was never contacted over the course of the investigation. (Pltf. Ex. A ¶ 44, 46). None of the eight NOIs received by Taylor were marked "Final" or "Suspension." (Dkt. 69 ¶ 72; Dkt. 74 ¶ 72; Def. Ex. 7 at 6, 15–16, 18, 21–23 25–26). The two final NOIs Taylor received in March 2018 prior to his termination each indicated his performance would be reviewed in ninety days. (Dkt. 69 ¶ 72; Dkt. 74 ¶ 72; Def. Ex. 7 at 22, 25–26). Taylor claims he never received a performance review while working for PSC. (Pltf. Ex. A ¶ 45). After Taylor was terminated, PSC hired a younger individual to fill his position. (Dkt. 69 ¶ 85; Dkt. 74 ¶ 85; Pltf. Ex. A ¶ 50).

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

## DISCUSSION

### A. Evidentiary Analysis

Both parties raise objections to the admissibility of evidence submitted and relied upon by the opposing party. (Dkt. 70; Dkt. 73). First, Defendant asks this Court to take judicial notice of documents related to another discrimination case filed by Plaintiff in this judicial district, and Plaintiff objects due to prejudicial effect. (Dkt. 64). While the Court may take judicial notice of court records and admit them as evidence, this Court determines that the prejudicial effect outweighs the probative value to admitting a prior settlement in a discrimination case involving the same parties. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997). As such, the Court did not take into consideration the documents related to the past discrimination claim between Taylor and PSC. (Def. Ex. 3; Def. Ex. 4; Def. Ex. 5; Def. Ex. 9; Pltf. Ex. B; Pltf. Ex. C).

Defendant asks the Court to take judicial notice of documents related to the review of a charge of discrimination filed with the Illinois Department of Human Rights ("IDHR") and EEOC. (Dkt. 64). Administrative findings regarding claims of discrimination are admissible under Rule 803(8)(C). *Young v. James Green Management, Inc.*, 327 F.3d 616, 624 (7th Cir. 2003). However, the district court holds discretion over whether such material should be admitted. *Id*. (citing *Halloway v. Milwaukee County*, 180 F.3d 820, 827 n. 9 (7th Cir. 1999)). The court is always required to weigh the prejudicial effect of admitting information against its probative value. Fed. R. Evid. 403. Congress gave parties a right to de novo review by district courts when assessing a discrimination claim, such that "the fact-finder is a district judge rather than an administrative agency hearing officer." *See Silverman v. Board of Educ. of City of* Chicago, 637 F. 3d 729, 732 (7th Cir. 2011)(quoting *Tulloss v. Near North Montessori School, Inc.*, 776 F.2d 150, 152 (7th Cir. 1985)).

14

Other courts in this district excluded administrative findings regarding claims of discrimination at the summary judgment phase. *See Germano v. International Profit Ass'n. Inc.,* 2007 WL 3243857, at *3 n. 7 (N.D.Ill. Nov. 1, 2007); *Silverman v. Board of Educ. Of City of Chicago*, 2010 WL 3000187 at *7 (N.D.Ill. July 26, 2010). In *Silverman*, the court concluded against considering the EEOC's determination on the ground that it was not relevant as the court "presumably has the same evidence before it that the EEOC had." *Silverman*, 2010 WL at *7 (affirmed in *Silverman*, 637 F.3d). The Seventh Circuit found the fact that some evidentiary material was available to the EEOC but not separately available to the district court did not alter the analysis since "the parties had every opportunity to present their full case." *Silverman*, 637 F.3d at 733. This Court will similarly not incorporate the IDHR report of findings in the review. (Def. Ex. 2.)

Plaintiff argues that portions of Defendant Group Exhibit 7 ("Exhibit 7") are inadmissible hearsay and should therefore be excluded from the Court's analysis. (Dkt. 70). In particular, Plaintiff asserts that any portion of Exhibit 7 related to Taylor's time working at Hawthorn Mall is hearsay without meeting an exception. Plaintiff also objects to other portions of Exhibit 7 as containing hearsay without an exception, including email complaints and disciplinary write ups. (Dkt. 70).

A signed affidavit by Director Mishra was provided as the authentication and foundation for Exhibit 7's admissibility under the business-record exception. (Def. Ex. 8). Mishra testified to his familiarity with the documents as having been "created and maintained by PSC in the ordinary course of business." (Def. Ex. 8 ¶ 4); Fed. R. Evid. 803(6). While Mishra was the Security Director at Old Orchard and not at Hawthorn Mall, his role as Security Director satisfies the broad requirements for a "qualified witness," and Plaintiff makes no allegations against

Mishra's trustworthiness. Fed. R. Evid. 803(6); *U.S. v. Muhammad*, 928 F.2d 1461, 1469 (7th Cir. 1991) ("The phrase qualified witness is to be broadly interpreted as requiring only someone who understands the system. . . . The exception does not require that the witness personally participated in the creation or maintenance of the document, nor even know who actually recorded the information." (internal quotations omitted) (citing *United States v. Moore*, 791 F.2d 566, 574–75 (7th Cir. 1986); *United States v. Keplinger*, 776 F.2d 678, 694 (7th Cir. 1985))).

Even if the complaints and emails included did not meet the requirements for the business records exception, the content would still be admissible for showing PSC's state of mind but not the truth of the conduct alleged. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574–75 (7th Cir. 2021). The fact that Taylor worked at Hawthorn Mall and committed violations according to the same employer during that time, that tenants asked for his removal, and that he was given the option of resigning from Hawthorn Mall or being transferred to Old Orchard arises out of the same set of operative facts, explains his actions in response to being informed of the tenant's wishes, and explains the employer's state of mind. The employment at Hawthorn is admissible. The Court admits Exhibit 7 in full under the business records exception to hearsay and for the above stated reasons.

Defendant similarly objects to the admissibility of Plaintiff Group Exhibit D ("Exhibit D") to the extent the materials are not also included in Defendant Group Exhibit 7 as hearsay without an exception. (Dkt. 73). Plaintiff provided no foundation or authentication for the admissibility of Exhibit D under any exception to hearsay. Fed. R. Evid. 803. As such, this Court excludes Exhibit D as inadmissible hearsay for the purposes of deciding the motion for summary judgment.

## B. Discrimination Claim Analysis

16

Under the Age Discrimination in Employment Act ("ADEA"), it is illegal for an employer to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To establish age discrimination under the ADEA, a plaintiff may use either the direct method of proof or the indirect, burden-shifting, method of proof. *Naik v. Boehringer Ingelheim Pharms.*, 627 F.3d 596, 599 (7th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Regardless of which method a plaintiff proceeds under, "the plaintiff must demonstrate that the employer would not have made the adverse employment decision in question *but for* his membership in a protected class." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061–62 (7th Cir. 2003) (emphasis added) (citing *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002); *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 571 (1998)).

District courts need not sort evidence into "direct" and "indirect" labels but should review the evidence in its entirety and focus on "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge." *Ortiz v. Werner Enterprise, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).

The "indirect" method of analysis established under the *McDonnell Douglas* framework provides a useful template for assessing whether Taylor can establish a *prima facie* case of discrimination. *Khungar v. Access Community Health Network*, 985 F.3d 565, 573 (7th Cir. 2021) (citing *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). If Taylor successfully establishes a *prima facie* case of age discrimination under *McDonnell Douglas*, "the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *David v. Board of Trustees of Community College District No. 508*,

846 F.3d 216, 225 (7th Cir. 2017) (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)). To establish a *prima facie* case under the *McDonnell Douglas* framework, a plaintiff must show that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Khungar*, 985 F.3d 565, 573 (quoting *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016)).

Taylor was 59 years old when PSC hired him, so he is a member of the protected class under the ADEA since he is over forty years old, satisfying the first factor. (Dkt. 63 ¶ 17; Dkt. 69 ¶ 17); *See Martino v. MCI Communications Services, Inc.*, 574 F.3d 447, 453 (7th Cir. 2009). The third issue in the *McDonnell Douglas* framework is not disputed since Taylor's employment was terminated by PSC. (Dkt. 70; Dkt. 73). When the core issue in the dispute is the question of whether an individual "performed poorly and whether that poor performance caused [his] termination" a court need only go through the analysis of job performance once with the goal of determining whether the evidence in its entirety would allow a reasonable factfinder to conclude that Taylor's age caused his termination. *Id*. at 574; *see also Ortiz*, 834 F.3d at 765.

### i. Taylor's Job Performance

Taylor is unable to establish that he was meeting the legitimate standards of PSC during the time of his employment. Over the course of his tenure at two different locations, Taylor was the subject of eight NOI disciplinary write ups. (Def. Ex. 7 at 6, 15–16, 18, 21–23, 25–26). At Hawthorn Mall, the General Manager requested by name that Taylor no longer work security on the premises. (Def. Ex. 7 at 9). PSC at that time did not terminate Taylor but rather offered him a transfer to a new location. *Id*. at 20; (Pltf. Ex. A ¶ 8). At the second location, after receiving six NOI disciplinary write ups and being flagged over the course of 27 months as behaving

unprofessionally, again, the General Manager of the premises requested Taylor be removed from working security at the mall. (Def. Ex. 7 at 15–16, 18, 22–23, 25–26, 33).

To determine whether Taylor met the legitimate expectations of PSC, "[t]he proper inquiry mandates looking at [his] job performance through the eyes of [his] supervisors at the time." *Khungar*, 985 F.3d at 574 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008)). In reviewing the record of NOIs as well as other business communications detailing unsatisfactory interactions with Taylor, it is undisputed that at the time Taylor was terminated, his performance as a security officer did not meet PSC's standards. The only admissible evidence offered by Taylor to support his claim that he met PSC's expectations is his personal affidavit of his account, in which he disputes the certain details of the incidents or offers justifications such as never having received any of the NOIs in hand; yet he fails to refute that the incidents took place. (Pltf. Ex. A).

Taylor claims that similarly situated employees who were not members of the protected class were treated more favorably but offers minimal admissible evidence to support his claim either in the manner in which they were treated or to establish they were similarly situated employees.[2] (Pltf Ex. A ¶ 30, 40, 42). Plaintiff has the burden of proving his case and this would include identifying and deposing those individuals he believed to be similarly situated and treated differently. He failed to do so. Taylor did not establish a *prima facie* case for age discrimination.

### ii.    Evidence of Pretext

Even if Taylor could establish a *prima facie* case for age discrimination, it would result in the burden shifting to PSC to produce a legitimate, nondiscriminatory reason for their decision to

---

[2] "[S]upervisors limited my work to foot patrol while assigning other duties to the younger officers during my shift, like vehicle patrol, running dispatch, and monitoring the computers." (Pltf. Ex. A ¶ 30). "There are employees who were younger than me and did not sign Notices for Improvements that were issued to them. They were not criticized for not signing. I remember one of these employees being Mohamad and he was 19 years old." *Id*. at ¶ 40. "All of the younger security officers had their IDs and were able to do the scans." *Id*. at ¶ 42.

fire him.  Once PSC established a legitimate reason for the discharge, the burden shifts back to Taylor, who may rebut the reason by proving it is merely pretext for discrimination.  *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016).  The question is not "whether [PSC's] decision was right, but whether [Taylor] presented sufficient evidence that [PSC's] reason was a lie for the action it took."  *Walter v. Glickman*, 241 F.3d 884, 890 (7th Cir. 2001); *see also Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 ("[W]e look to 'whether the employer gave an honest explanation of its behavior.") (quoting *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir. 1987)).  The Court "does not sit as a super-personnel department that reexamines an entity's business decisions."  *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). The only evidence Taylor provides for pretext is his belief that the actions taken against him were due to his age.  (Pltf. Ex. A); *see Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) ("[Plaintiff] has failed to point to any evidence, other than his belief that [his employer's] assessments of his workplace behavior were mistaken, from which a jury could infer that [his employer] terminated him because of his age.  Therefore, his age discrimination claim fails.").

PSC has set forth ample legitimate reasons for their decision to terminate Taylor and there is no evidence in the record that these reasons were pretextual.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment [62] is granted. Plaintiff Richard Taylor failed to establish a *prima facie* case for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.

Virginia M. Kendall
United States District Judge

Date: March 31, 2022